BENTON v. WARD et aL

(Circuit Court, N. D. Iowa, E. D. January 13, 1894.)

EQUITY—RESCISSION OF CONTRACTS—FALSE REPRESENTATIONS.
> One who, while negotiating for the purchase of stock in a corporation represented to own a new and secret process for treating metals, and to have applied for a patent therefor, learns, before completing the purchase, all that the vendors know in relation to such process, its invention and ownership, and that the patent has been rejected because of a prior expired patent covering substantially the same process, and nevertheless completes the purchase as a speculative venture, cannot, after the expiration of a year, during which he endeavored to effect a sale of the process in behalf of the company, rescind his contract, tender back his stock, and sue for the purchase price.

In Equity. Suit by Harlan P. Benton against Julius A. Ward and others for rescission of a contract for sale of certain shares of capital stock in the Hawkeye Metal Company. A demurrer to the bill was heretofore overruled. 47 Fed. 253. The cause is now on final hearing. Bill dismissed.

Carman N. Smith, for complainant.
Charles A. Clark and Rickel & Crocker, for defendants.

SHIRAS, District Judge. This is a suit in equity brought to rescind a contract of sale, in pursuance of which the defendants each assigned to the complainant 500 shares of stock in the Hawkeye Metal Company. In the bill of complaint it is averred that, for the purpose of inducing the complainant to buy the shares of stock in question, the defendants represented and stated to him that the Hawkeye Metal Company was the owner and sole proprietor of a secret process of treating metal, known only to the stockholders in the company; that said process was new and valuable; that a patent therefor had been applied for, and would unquestionably be granted; that such process would greatly increase the value of metal treated thereby; that the Hawkeye Company was prepared to commence the business of applying such secret process to the treatment of metals; and that, if complainant would purchase the shares of stock in question, he would be employed at once in the capacity of president and general manager of the company at a salary of $3,000. It is further charged in the bill that, relying upon these statements, the complainant purchased the thousand shares of stock, paying therefor the sum of $4,000, but that it now appears that substantially the representations made as above set forth were false, and that the complainant, upon discovery of the fraud, had tendered back the shares of stock and demanded the repayment of the $4,000; and the court is asked to decree a rescission of the contract of sale, with a judgment for the repayment of the purchase price. The case has been submitted upon the pleadings and proofs, and, from the evidence, the general history of the transaction appears to be as follows:

In October, 1889, the defendant Ward visited Minneapolis, Minn., and there met the complainant, Benton. Ward had with him a specimen of metal, which he exhibited to Benton, informing him that

it was treated by a secret process owned by the Hawkeye Metal Company; that the company wished to secure the services of a competent person to take an interest in the business, and undertake the management of the affairs of the company; that an application for a patent in the interest of the company was being made; that he could not divulge the secret of the process, as the stockholders were under obligation not to make the same known to outsiders,—and thereupon Ward proposed to Benton that he should buy some of the stock of the company, and become interested in the enterprise. To this Benton replied that, if he was to take an interest in the matter, he must know more about the metal. It was thereupon agreed that the parties should meet in Chicago about November 1, 1889, which meeting took place. While in Chicago the complainant visited the place where the metal was being made for the Hawkeye Metal Company, and saw Mr. Worrall, who, as it was then understood, was the discoverer of the process in question. He also interviewed the street-railway companies who were using the product of the metal treated by the secret process, and learned their views of the value of the metal. He was also introduced to the attorneys who had charge of the application for a patent on behalf of the Hawkeye Company. Finally, he entered into negotiations with Mr. Ward for the purchase of stock in the company, coupled with the conditions that he should be made president and general manager of the Hawkeye Company at a fixed salary. These negotiations resulted in a written contract, dated December 20, 1889, whereby the defendants agreed to sell to complainant 1,000 shares of stock in the Hawkeye Metal Company for the sum of $4,000, payable January 7, 1890, and further agreed to use their influence and best efforts to have the complainant elected to the position of president and general manager of the company at a salary of $250 per month; the said defendants further agreeing to contribute in stock or money their proper share of the expense needed to carry on the contemplated business.

At the stockholders' meeting held in January, 1890, the complainant was duly elected president and general manager of the Hawkeye Metal Company at a salary of $250 per month, and thereupon, on the 7th day of January, he completed the purchase of the stock by paying to Henry Rickel the sum of $2,000 for the 500 shares sold by him, and to Julius A. Ward $2,000 in cash, with a duebill of $2,000, it appearing from the evidence that complainant had agreed to pay Ward double the amount that was to be received by Rickel. When the complainant thus completed the purchase of the stock, and took charge of the affairs of the Hawkeye Metal Company, the evidence shows that he then fully knew the nature of the process for treating metals which it was expected would be followed in the business of the company; that he had as full knowledge, and the same means of knowledge, as any of the parties in regard to the product of the process and the value of the same; that he knew that a patent therefor had not been obtained, and that the application originally made had been denied by the patent office; that he knew that the defendants and the company had been deceived in supposing that Worrall was the original discoverer, it then appearing that one

Cole was in fact the discoverer thereof; and he knew that the defendants and other stockholders expected him to take charge of the business of the company, relying upon him for the business ability needed to successfully manage the affairs of the company. Under these circumstances, the complainant paid the purchase price of the stock bought by him, and entered upon the management of the affairs of the company. It appears that there was a difficulty in getting a suitable place to carry on the work of the company, and also there was a lack of funds such as would be needed to engage in the manufacturing of the metal, and thereupon the complainant entered into negotiations with the Bromley Brake-Shoe Company for a transfer of the interest of the Hawkeye Metal Company; and subsequently a new company, called the Chicago Refined Metal Company, was organized by the complainant and Cole for the purpose of taking the interest of the Hawkeye Metal Company, but it seems that this purpose was not finally completed. The complainant testifies that in August, 1890, he had seen the application for a patent, with the ruling of the patent office thereon, and had become satisfied that a patent could not be had, owing to the patent issued to John Burt in 1869, and therefore, as a director in the Chicago Refined Metal Company, he voted against completing the contract with the Hawkeye Metal Company; and from this time forward he seems to have abandoned all effort to further advance the affairs of the Hawkeye Metal Company.

In the correspondence carried on between the complainant and the defendant Ward, which is very voluminous, the first and main ground of complaint relied upon by the complainant was the alleged failure to furnish sufficient funds to carry on the business of the company. It was not until in January, 1891, that the complainant tendered back the shares of stock, and demanded a repayment of the $4,000 cash by him paid for the stock. In the argument of counsel for complainant it is stated that the representations made by the defendants to induce complainant to purchase the stock were false in two particulars: (1) The process which they claimed to own was not a new, secret process; (2) the Hawkeye Metal Company did not own the process.

In support of the first proposition, reliance is placed upon the claim that the patent to John Burt, issued in 1869, covers the same process, and therefore, in the language of counsel, "it had been a matter of public record for twenty years." Granting the claim that the Burt patent in fact described the process used by the Hawkeye Metal Company, the question arises whether that fact proves that the representations made by the defendants were substantially false. It is not shown in the evidence that Burt, or any one claiming under him, ever manufactured or put in use any metal treated by his process. So far as the proof is concerned, it simply appears that in 1869 a patent was issued to Burt, but it does not appear that the knowledge of the process proceeded further. Many an invention and many an idea of value are doubtless to be found in the records of the patent office, but, so far as public actual knowledge thereof is concerned, they might as well be nonexistent. The fact that a

patent had been issued in 1869 to Burt might be sufficient to defeat the issuance of another patent, but it does not necessarily show that the representations made by the defendants were false. It is not claimed on behalf of the complainant that ground exists for a rescission of the contract by reason of the failure to procure a patent, and, in view of the evidence, such claim, if made, could not be sustained. In the first place, it is not claimed that the representations were falsely made knowingly. In the second place, so far as the representations referred to the procurement of a patent, they could be only the expression of opinion touching a future event. In the third place, the complainant himself testified that, when the negotiations for a sale of the stock were in progress, the proposition made to him was to charge him $6,000 for the stock if sold before the issuance of a patent, and $8,000 if he waited until the patent was issued. He elected to purchase at the rate of $6,000, and in the written contract there was no guaranty of the issuance of a patent. It must, therefore, be held that the validity of the sale of the stock was not made dependent upon the success or failure to procure a patent. The complainant was not willing to pay $2,000 to be assured that a patent would be issued, and he must now abide by the election he made when he entered into the contract. Upon the issue whether the process was in fact a new and secret one, the burden is upon complainant to establish the fact that it was not, and I do not think the evidence clearly shows such to be the case. It does not appear that metal treated by this process was in the market, or was in use by any one except the few who procured it from the Hawkeye Metal Company and those connected therewith. The Burt patent issued in December, 1869, expired in 1886, and it would not prevent the use of the process.

As already stated, it does not appear that the use of the metal had been introduced under that patent, and, so far as the public were concerned, the process remained unknown. It was therefore open to any one who should rediscover the process to enter upon the manufacture of metal under that process, and, by guarding the secret of manufacture, reap all the benefit possible therefrom. The representations claimed to have been made by the defendants in regard to the process being new and secret must be reasonably construed. The meaning thereof cannot be held to have been an affirmance of absolute novelty. If the knowledge of the process was not had by those engaged in that line of business to which the process pertained, then it was practically a new and secret process. The defendants cannot be held liable for having made false statements in this particular by showing that one person, years ago, had knowledge of the process; and that is all that is shown by proof of the granting of the Burt patent. When the representations complained of were made by the defendants, it might well be that Burt and all who had ever acquired knowledge of his process were dead. So far as the evidence shows, the only knowledge extant of his process was that afforded by the record of his patent, issued in 1869. In the absence of evidence showing that in 1889, when the sale was made to the complainant, any one had actual knowledge of the existence of this

patent, or of the process therein described, or showing that the process was in use or was known to the business world, it cannot be held that the representations charged against defendants were false simply because it now appears that the Burt patent was of record.

The second ground taken by counsel for complainant is that the Hawkeye Metal Company did not own the process, and therefore the sale of stock was procured by false representations. The Hawkeye Metal Company had knowledge of the process, and possessed appliances for the practical use of the same, and thus owned the process to the extent that ownership is possible of an invention not covered by a patent. When the sale of stock was made to the complainant he then knew that the company did not have a patent upon the means of applying the process in question, and he must have known that the only ownership possible to be had by the Hawkeye Company was that predicated on the possession of the knowledge of the process, and of the means necessary to its application. The fact that James W. Cole, the original discoverer of the process, had assigned the same to John Cole, did not deprive the Hawkeye Metal Company of the knowledge of the process nor of the right to use it. The fact that the company was defeated in its application for a patent does not show that the defendants had made false representations in regard to the ownership of the process. The denial of the patent applied for was not put upon that ground, and the main position taken by the complainant is that the issuance of the Burt patent was what defeated the issuance of a patent in the interest of the Hawkeye Metal Company.

For these reasons it must be held that the evidence fails to sustain either one of the two grounds upon which complainant rests his case in the written argument submitted on his behalf. It might be further claimed that there was evidence tending to show that some other parties in Chicago and elsewhere had knowledge of the process derived from James W. Cole, and parties associated with him. It appears, however, from the evidence, that complainant knew these facts as well as the defendants before he completed the contract of purchase, and he must be held to have assumed the risk arising from this knowledge. The evidence clearly shows that the enterprise which the Hawkeye Metal Company was organized to carry on was speculative in its nature. The complainant, when he purchased his stock, knew this fact, and bought the same as a speculation. He was placed in full charge of the affairs of the company, and devised several plans looking to making advantageous sales of the interest of the company. He was in position, on and after the 7th of January, 1890, to fully ascertain all the facts connected with the business of the company. He did not tender back the stock until in January, 1891. He himself testified that in August, 1890, he became fully satisfied that the process was not new or secret, having been anticipated by the Burt patent of 1869; yet he took no action to secure a rescission of the contract until the following January. Even if the evidence had shown a state of facts which would have justified a court of equity in granting a decree of rescission, if the application had been promptly made, the delay on part of complain-

ant is fatal to his case. The complainant was made president and general manager of the company, and he accepted the position, and, so long as there was a prospect that the speculation might prove remunerative, he retained the stock and the control of the company's affairs. When the tender back of the stock was made to the defendants, in January, 1891, the whole situation had greatly changed, and the parties could not be placed substantially in the position they occupied when the contract for the sale of the stock was made.

For these reasons it must be held that the complainant has failed to make out a case which entitles him to a rescission of the contract of sale. That the expectations which he had formed at the time he assumed the management of the affairs of the Hawkeye Metal Company have not been met is undoubtedly true, but that seems to be equally true of the expectations of the defendants. The enterprise was largely speculative, and was so known to be to the complainant when he connected himself therewith. Having retained the control of the affairs of the company for so long a period, and having retained the stock sold him for months after he had ceased to work in the interest of the company, he cannot expect that a court of equity will now throw the whole burden of the failure of the speculation upon the defendants, and relieve him wholly therefrom.

The bill will therefore be dismissed upon the merits, at the cost of complainant.